# United States Court of Appeals
## For the First Circuit

No. 01-2237

WILLIAM CAVALLARO; PATRICIA CAVALLARO,

Petitioners, Appellants,

v.

UNITED STATES,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

William H. Paine with whom Mary B. Strother and Hale and Dorr LLP were on brief for appellants.
Edward T. Perelmuter, Attorney, Tax Division, Department of Justice, with whom Eileen J. O'Connor, Assistant Attorney General, Richard Farber, Attorney, Tax Division, Department of Justice, and Michael J. Sullivan, United States Attorney, of counsel, were on brief for appellee.

April 1, 2002

**LYNCH**, **Circuit Judge**.    This case raises important questions about the scope of the attorney-client privilege. William and Patricia Cavallaro ("Cavallaros") owned Knight Tool Co., Inc., founded in 1976.    Their adult sons owned Camelot Systems, Inc., created in 1987.    The Cavallaros and their sons merged their respective corporations in 1995 and, on July 1, 1996, the merged entity sold for approximately $97 million. Subsequently, the Internal Revenue Service began an investigation into the Cavallaros' correct estate and gift tax ("transfer tax") liabilities.    The IRS suspected that the parties might have undervalued the Cavallaros' Knight company and overvalued the sons' Camelot company to disguise a gift to the sons in the form of post-merger stock.

In the course of this investigation, the IRS served a summons on Ernst & Young, an accounting firm that Camelot had retained in June of 1994.  The summons requested that Ernst & Young produce "all records" in its possession regarding any work it did between 1984 and 1995 for the Cavallaros, their sons, and their respective corporations. The Cavallaros moved to quash the summons as overly broad and calling for privileged materials.  They argued that the documents in Ernst & Young's possession were protected by the attorney-client privilege because the documents were created by, or provided to, Ernst & Young in the course of the efforts of the law firm Hale and Dorr to provide legal advice; particularly, advice sought in 1994 and 1995 concerning transfer tax and merger issues arising from the close relationship between Camelot and

-2-

Knight.  The IRS counterclaimed for enforcement of the summons.  On July 27, 2001, the district court denied the Cavallaros' petition to quash and allowed the government's motion to enforce the summons.  Cavallaro v. United States, 153 F. Supp. 2d 52 (D. Mass. 2001).  Subsequently, the district court granted the Cavallaros' motion for stay pending appeal, thereby permitting the Cavallaros to continue to refrain from disclosing the documents that they allege are privileged.

As in the district court proceedings, three categories of documents requested by the IRS are at issue: (1) documents pertaining to the December 19, 1994, meeting -- between the Cavallaros, their sons, a Camelot accountant, accountants from Ernst & Young, and at least one lawyer from Hale and Dorr -- addressing transfer tax issues; (2) subsequent transfer tax communications arising from the December 19 meeting; and (3) documents related to communications addressing the 1995 merger of Knight and Camelot.  All of the requested documents are in Ernst & Young's possession.  They are all documents either created by Ernst & Young or transmitted to Ernst & Young, not documents preserved solely in Hale and Dorr's files.

On appeal, as in the district court, the Cavallaros argue that these documents are privileged under United States v. Kovel, 296 F.2d 918 (2d Cir. 1961), despite having been either created by or disclosed to Ernst & Young, because Ernst & Young aided Hale and Dorr in providing legal advice.  They also argue that the documents

fall within the common-interest exception to the rule that disclosure to a third party waives the attorney-client privilege.

Assuming arguendo that this circuit would adopt the <u>Kovel</u> rule, we conclude that the documents are not privileged. We follow somewhat different reasoning than the district court. We need not decide whether, in all instances, the attorney or client (as opposed to some third party) must hire the accountant in order to sustain a privilege under <u>Kovel</u>. <u>Kovel</u> requires that to sustain a privilege an accountant must be "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." 296 F.2d at 922. Here, no party hired Ernst & Young for this purpose. Therefore, the attorney-client privilege did not extend to the documents in question under the <u>Kovel</u> doctrine. Having found that the documents were not covered by the attorney-client privilege, we also conclude that they cannot fall within the common-interest exception, which presumes a valid underlying privilege in the first place. Consequently, we do not reach the district court's conclusion that "[u]nder the strict confines of the common-interest doctrine, the lack of representation for [the sons and Camelot] vitiates any claim to a privilege," <u>Cavallaro</u>, 153 F. Supp. 2d at 61, because Ernst & Young was providing accounting services and so the <u>Kovel</u> extension of the privilege is inapplicable to the summoned documents, all of which were created by or disclosed to Ernst & Young.

**I.**

The following facts are undisputed except where otherwise noted. In 1976, the Cavallaros formed Knight Tool Co., Inc., to manufacture tools to be used by companies such as McDonnell Douglas, Polaroid, and Raytheon to assemble their products. Seven years later, in 1983, William Cavallaro and one of his three sons, Kenneth, developed a rudimentary glue-dispensing machine, which, for several years, was commercially unsuccessful due, at least in part, to difficulty in marketing the machine.

In 1987, the Cavallaros formed a new company, Camelot Systems, Inc., to give the Cavallaros' three sons an opportunity to pursue the glue-dispensing machine business. In addition to paying its own employees, Knight paid the salaries of Camelot's employees. The three sons were named as Camelot's sole shareholders and, although Knight continued to make the glue-dispensing machines, Camelot became the machines' only distributor. Knight was Camelot's biggest supplier. In fact, Camelot's only business was selling glue-dispensing machines and accessories manufactured by Knight. The sons, working at Camelot, completely redesigned the Knight glue-dispensing machine and developed several new models of the machine. As a result, Camelot became a lucrative business.

In 1992, the Cavallaros contacted attorney Louis Hamel Jr. Hamel was a long-time senior partner at the Hale and Dorr law firm, specializing in trusts and estates, exempt organizations, and pensions. He, along with other Hale and Dorr attorneys,

periodically counseled the Cavallaros regarding Knight corporate matters.

The Cavallaros again contacted Hamel, in October 1994, this time for help with estate and retirement planning. Hamel considered, among other things, potential transfer tax issues arising in the context of the close business and family relationships between Knight and Camelot. Between December 19, 1994, and December 31, 1995, Hale and Dorr provided legal advice to Knight and the Cavallaros, acting on Knight's behalf, with respect to the merger of Knight into Camelot. Hale and Dorr advised the Cavallaros on, among other things, the drafting of affidavits purporting to establish the pre-merger values of Knight and Camelot.

While the Cavallaros were receiving legal advice from Hale and Dorr, their sons, as agents of Camelot, had begun receiving tax planning advice from Ernst & Young. Camelot began meeting with Ernst & Young in June of 1994. On November 16, 1994, Ernst & Young documented its relationship with Camelot in a letter of engagement, stating that Ernst & Young would be providing a "Review of Corporate Structure and Recommendations," a "Tax Checkup," and "Transfer Planning." The letter, addressed to David Frac, Camelot's Chief Financial Officer, further stated that "[a]ll advice and other services we provide pursuant to this engagement are solely for the benefit of Camelot . . . and not for the benefit of anyone other than the corporation and its shareholders." Frac signed the letter and returned it to Ernst & Young.

A draft of the invoice, however, for Ernst & Young's services rendered through December 31, 1994, which explicitly included tax services rendered pursuant to the November 14 engagement letter, refers to services rendered to both Camelot and Knight. It was addressed and mailed to Mrs. Cavallaro at Knight. In addition, Lawrence Goodman, of Ernst & Young, testified in his October 27, 2000, deposition that, in 1994, he was involved in providing tax advice to Camelot, Knight, and the Cavallaros. He also testified that around November or December of 1995, an Ernst & Young employee began providing services to both Camelot and Knight. The district court, nonetheless, concluded that "the undisputed evidence is that Ernst & Young was paid by, and worked solely for, Camelot and its shareholders." Cavallaro, 153 F. Supp. 2d at 58.

On December 15, 1994, Ernst & Young sent a letter to William Cavallaro recommending the merger of Knight and Camelot and suggesting a strategy for minimizing transfer tax liability. Ernst & Young understood that the Cavallaros and their sons would consider selling their respective companies, and proceeded to explain how the parties might structure the corporate relationship in order to facilitate a transfer of some of the proceeds from such a sale from the Cavallaros to their children while minimizing tax liability. Ernst & Young stated that the letter would "serve as the discussion document" for an upcoming meeting between Ernst & Young, Hale and Dorr, the Cavallaros, their sons, Kevin McGillivary (an accountant working for Camelot), and David Frac of Camelot.

The letter explained that the IRS would scrutinize the pre-merger values of Knight and Camelot to determine the proper allocation of the post-merger sale proceeds between the Cavallaros and their sons. The pre-merger values were important because they would be the benchmark for determining whether the Cavallaros had disguised a gift to their sons in the form of post-merger stock and, if so, the size of that gift and the resulting transfer tax liability. Ernst & Young stated that the pre-merger profit disparity between Knight and Camelot did not reflect the true values of the companies:

> The current structure and resulting profit split does not seem to reflect the economic reality of the business arrangement. If one were to combine the entities, as currently structured, approximately 70% of the profit is earned by the Company that bears no risk with respect to product development, has no employees, does not bear any costs of sales, does not service or provide any warranty coverage on the product or own any of the technology. In a normal distributor relationship . . . . this arrangement does not exist.

The IRS, Ernst & Young said, would likely attribute most of the value of the post-merger corporation to the Cavallaros, which would defeat the tax saving goal of allocating most of the profits of the pre-merger corporations to their sons. The letter stated that "[b]ased on the facts that exist today, it would be hard to justify Camelot taking more than a small amount of the allocated proceeds" from a sale of the businesses. More specifically, Ernst & Young suggested that, upon merger, as much as 85% of the shares of the merged entity would go to the Cavallaros, with only 15% of the shares going to their sons.

It appears that the Cavallaros desired a post-merger distribution more favorable to their sons, but that a post-merger redistribution would create significant transfer tax liability. Ernst & Young proposed a solution. Ernst & Young recommended a "two step approach" to "eliminate[ ] the exposure related to reallocation of income." Step one was to merge Knight and Camelot. Step two "involve[d] the gifting of stock in the merged entity by [the Cavallaros] to [their sons] in the amounts that would result in the desired ownership split." Ernst & Young recommended that the gifting be done using a Grantor Retained Annuity Trust. This gifting was necessary, according to Ernst & Young, because of the real pre-merger distribution of assets, which heavily favored Knight and the Cavallaros and disfavored Camelot and the sons.

Prior to December 19, 1994, the parties agree that Ernst & Young and Hale and Dorr were not working together or in a coordinated fashion, even if each firm knew that the other was somehow involved in advising the Cavallaros, their sons, or the companies. On December 19, the Cavallaros, their sons, a Camelot accountant, accountants from Ernst & Young, and at least one lawyer from Hale and Dorr met as planned. This meeting is important to the case because the Cavallaros assert that, at this meeting, "Ernst & Young began assisting Hale and Dorr with respect to providing advice on transfer tax issues." The Cavallaros say that Ernst & Young continued in this role, as an assistant to Hale and Dorr, through 1995. At the meeting, neither Camelot nor the sons

were represented by an attorney; Hale and Dorr represented only the Cavallaros.

It is unclear what happened next. As the IRS has stated, this is, at least in part, what they are attempting to investigate by way of the challenged subpoena. What we do know is that the Cavallaros did not follow Ernst & Young's December 15, 1994, recommendations. Instead, on May 23, 1995, Mr. Cavallaro and one of his sons signed affidavits that were at odds with Ernst & Young's conclusion that "it would be very hard to justify Camelot taking more than a small amount of the allocated proceeds" from a sale of the businesses. Hale and Dorr, not Ernst & Young, prepared these affidavits. In these two separate, but nearly identical affidavits, Mr. Cavallaro and his son stated that Knight had transferred, for no compensation, its glue-dispensing machine technology to Camelot when Camelot was formed in 1987. They stated that, at the time of the transfer, the technology "had no ascertainable value," "had no reasonable prospect of realizing a profit," and was "no more than a promising but raw idea." They stated that Camelot "entirely redesigned the original dispensing product." Knight and Camelot then supplemented these affidavits with a confirmatory bill of sale, also dated May 23, 1995, purporting to confirm the previously undocumented gift from Knight to Camelot. The Cavallaros say that Hale and Dorr had prepared drafts of all of these documents before the December 19, 1994, meeting.

This claimed, undocumented transfer was important to the pre-merger valuation of the companies and hence to the correct post-merger distribution of shares. On December 31, 1995, Knight merged into Camelot. As part of the merger, the Cavallaros received 19% of Camelot's stock. This allocation was based on Ernst & Young's December 31, 1995, valuation of the companies, which reflected the alleged, but undocumented, technology transfer. Ernst & Young's December 1995 valuation, attributing most of the value of the post-merger corporation to Camelot, was at odds with its 1994 suggestion that Camelot shares would form only a small part of the post-merger corporation's value. On July 1, 1996, the merged corporation was sold for approximately $97 million. The 1995 merger, based on the 1995 valuation, resulted in a distribution of assets to the Cavallaros' sons that substantially reduced the Cavallaros' transfer tax liabilities.

Suspicious of these circumstances, the IRS began a tax fraud investigation into the Cavallaros' correct federal tax liabilities for the years 1987 through 1996. The investigation focused on whether the Cavallaros had manufactured a prior gift to their children, through the use of the alleged technology transfer, to avoid transfer taxes. The IRS sought to determine whether Knight was undervalued and whether Camelot was overvalued at the time of the merger because, if this were the case, then the Cavallaros would have disguised a gift to their sons in the form of post-merger stock.

As part of this investigation, the IRS, on December 7, 1999, issued a third-party recordkeeping summons to Ernst & Young.[1] The summons began by requesting "[a]ll records relating to [Ernst & Young's] engagements with William, Patricia, Paul, Kenneth, or James Cavallaro[ ], Knight Tool . . . or Camelot Systems . . . at any time from 1984 through 1995." The IRS issued the summons because, in response to a prior summons it had issued in the investigation, it had obtained a copy of the December 15, 1994, Ernst & Young letter, which it believed "to be materially inconsistent with subsequent sworn statements made [by] William Cavallaro and a subsequent valuation rendered by Ernst & Young." The IRS stated that the 1994 valuation "sets forth a pre-merger analysis which is materially inconsistent with a subsequent valuation rendered by Ernst & Young . . . . [and] materially at odds with sworn statements submitted by William Cavallaro."

The Cavallaros moved to quash the summons as overly broad and calling for privileged materials. They argued that the summoned documents are privileged because Ernst & Young helped Hale

---

[1] The IRS issued its summons under the authority granted by 26 U.S.C. § 7602 (1994 & Supp. V 1999). That section states that

> [f]or the purpose of . . . determining the liability of any person for any internal revenue tax . . . the Secretary is authorized -- (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry; [and] (2) To summon the person . . . to appear before the Secretary . . . to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry.

Id. § 7602(a) (1994).

and Dorr provide legal advice beginning on December 19, 1994. They also argued that the documents fall within the common-interest rule.

Subsequently, the Cavallaros provided the IRS with a substantial number of documents, including excerpts from the diaries of Ernst & Young employees who worked for Knight or Camelot and what the Cavallaros say are nearly all of Knight's and Camelot's accounting records. This dispute is over those remaining documents that the Cavallaros have refused to produce.

The IRS counterclaimed for enforcement of the summons. On September 19, 2000, the district court heard arguments and authorized the IRS to depose Lawrence Goodman, a senior manager in Ernst & Young's tax department, primarily to determine whether any additional documents existed relating to Ernst & Young's work for the Cavallaros, their sons, and the two companies. Fed. R. Civ. P. 30(b)(6). After the deposition, Hale and Dorr provided the IRS with an amended privilege log and a letter stating the reasons why it believed each of the documents in the log to be privileged.

On July 27, 2001, the district court denied the Cavallaros' petition to quash and allowed the government's motion to enforce the summons. Cavallaro, 153 F. Supp. 2d 52. The district court noted that the communications in question -- that is, those documents that the Cavallaros continued to assert were privileged -- fell into three categories: "(1) notes from the December 19, 1994 meeting addressing transfer tax issues; (2) follow-up communications arising from the Dec. 19th meeting; and

(3) subsequent communications addressing the merger of the two companies." Id. at 56. These same categories of documents remain at issue.[2]

The district court reasoned that the documents were not privileged under Kovel, 296 F.2d 918, because the Cavallaros had failed to demonstrate that one of the key elements of a Kovel privilege was met: that is, the Cavallaros had not shown that Ernst & Young's role was to facilitate communications, between the Cavallaros and Hale and Dorr, made for the purpose of obtaining legal advice. Cavallaro, 153 F. Supp. 2d at 58. The "case does not fit into the Kovel paradigm," the district court held, because Ernst & Young, at all times, acted as an agent of Camelot and the sons, not as an agent of Hale and Dorr or the Cavallaros. Id. at 59.

As to the common-interest argument, the district court concluded that, at the December 19, 1994, meeting, and going forward, Hale and Dorr represented only the Cavallaros, and possibly Knight, but not the sons or Camelot. Id. at 61. Therefore, the district court held that, "[u]nder the strict

---

[2]    With respect to the notes from the December 19 meeting and any follow-up communications arising from this meeting, the Cavallaros state that they have already produced all of the requested documents that Ernst & Young created. They say that all of the transfer tax documents still claimed as privileged were either created by Hale and Dorr or sent to Hale and Dorr by other accountants working for the family or their businesses, with one exception: a letter from David Frac of Camelot to Lawrence Goodman, an Ernst & Young senior manager, regarding preparation for a meeting with Hale and Dorr. With respect to category (3), the merger, the Cavallaros say that several of the documents still withheld were created by Ernst & Young.

-14-

confines of the common-interest doctrine, the lack of representation for the remaining parties vitiates any claim to a privilege." Id. "[B]ecause only one party to this purported common-interest arrangement was represented by counsel," the district court held, "there is no valid claim of privilege under the common-interest doctrine." Id. at 62.[3]

## II.

"On an appeal respecting a privilege claim, the standard of review depends on the issue." United States v. Mass. Inst. of Tech., 129 F.3d 681, 683 (1st Cir. 1997). We review district court rulings on questions of law de novo; we review district court fact findings for clear error; and we review "discretionary judgments such as evidentiary rulings" for abuse of discretion. Id. Here the parties contest the formulation of both the Kovel doctrine and the common-interest doctrine, legal questions which we review de novo. The parties also contest the district court's findings of fact. Indeed, the Cavallaros assert that "the District Court found no facts," a claim which is an overstatement.

Neither the United States Constitution, nor any federal statute, nor any Supreme Court rule governs the proper scope of the attorney-client privilege in this case. Nor does state law provide the rule of decision. Fed. R. Evid. 501 states that in such cases, the issue "shall be governed by the principles of the common law as

---

[3] The district court did not address the government's argument that the documents fall under the crime-fraud exception. Cavallaro, 153 F. Supp. 2d at 58 n.3.

they may be interpreted by the courts of the United States in the light of reason and experience."

Before discussing exceptions to the attorney-client privilege, and exceptions to those exceptions, we first lay out the essential elements of the privilege, as described by Wigmore and previously endorsed by this court:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 J.H. Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961), quoted in Mass. Inst. of Tech., 129 F.3d at 684.

The rationale for the privilege is that safeguarding communications between attorney and client encourages disclosures by the client to the lawyer that facilitate the client's compliance with the law and better enable the client to present legitimate arguments should litigation arise. Mass. Inst. of Tech., 129 F.3d at 684. The privilege is well established; indeed, it "first appeared in the sixteenth century," P.R. Rice, Attorney-Client Privilege in the United States § 1:1, at 6 (2d ed. 1999), and it is "the oldest of the privileges for confidential communications known to the common law," Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also Wigmore, supra, § 2290, at 542. We note, but do not rely on, the doctrine of construing the privilege narrowly, which has particular force in the context of IRS investigations given the "congressional policy choice in favor of disclosure of

-16-

all information relevant to a legitimate IRS inquiry."[4]  United States v. Arthur Young & Co., 465 U.S. 805, 816 (1984).  Even in other contexts, there is a more general reason for construing the attorney-client privilege narrowly: the belief that "[t]he investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of these privileges." Wigmore, supra, § 2192, at 73; see also In re Grand Jury Subpoena, 274 F.3d 563, 571 (1st Cir. 2001) ("[T]he privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client.").

In contrast to the attorney-client privilege, "no confidential accountant-client privilege exists under federal law."[5]  Couch v. United States, 409 U.S. 322, 335 (1973), quoted in Arthur Young, 465 U.S. at 817; see also United States v. Arthur Andersen & Co., 623 F.2d 725, 729 (1st Cir. 1980) (declining to depart from Couch's general rule).  The parties to this litigation

---

[4]  "As a tool of discovery, the § 7602 summons is critical to the investigative and enforcement functions of the IRS." United States v. Arthur Young & Co., 465 U.S. 805, 814 (1984).  While § 7602 is "subject to the traditional privileges," United States v. Euge, 444 U.S. 707, 714 (1980), we are cautious of "recognizing exceptions to the broad summons authority of the IRS or in fashioning new privileges that would curtail disclosure under § 7602" absent clear congressional directions.  Arthur Young, 465 U.S. at 816-17.

[5]  In 1998, Congress established a limited privilege for accountant-client communications. Pub. L. No. 105-206, title III, § 3411, 112 Stat. 685, 751 (codified at 26 U.S.C. § 7525 (Supp. V 1999)).  The privilege, however, applies only to communications occurring after July 22, 1998. Id. § 3411(c).  Because all of the communications at issue occurred before this date, neither party argues that the statutory privilege applies here.

recognize as much, but agree, correctly, that accountant-client communications are privileged if they meet the traditional requirements of the attorney-client privilege. With this foundation laid, we turn to the Cavallaros' privilege claims.

The Cavallaros argue that the attorney-client privilege protects the three categories of subpoenaed documents, all of which are in Ernst & Young's possession. For a communication to be covered by the attorney-client privilege, the communication must be made in confidence. Wigmore, supra, § 2292, at 554. Another requirement is that the privilege not be waived. Id. The presence of third parties during an attorney-client communication is often sufficient to undermine the "made in confidence" requirement, 3 Weinstein's Federal Evidence § 503.15[3] (J.M. McLaughlin, ed., 2d ed. 2002), or to waive the privilege, E.S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 168-69, 189 (4th ed. 2001).

Here, however, the Cavallaros invoke two doctrines to support their claim that disclosing the subpoenaed documents to Ernst & Young neither undermined the confidentiality requirement nor waived the privilege. First, they say that the documents were all created or received by Ernst & Young after it began to assist Hale and Dorr in rendering legal advice and so the documents fall under the Kovel doctrine, which they characterize as holding that the presence of some third parties that are "necessary, or at least highly useful," to facilitating attorney-client communication does not destroy the privilege. 296 F.2d at 922. Second, they say that

-18-

the documents fall within what they call the "common-interest privilege." The Cavallaros bear the burden of establishing that the attorney-client privilege is a defense to the enforcement of the IRS's summons, but, if the privilege is established, the government bears the burden of showing that the privilege is defeated by an exception. Fed. Deposit Ins. Corp. v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000).

## A. Kovel

Generally, disclosing attorney-client communications to a third party undermines the privilege. United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (stating that "the attorney-client privilege generally applies only to communications between the attorney and the client"); Weinstein's Federal Evidence, supra, at § 503.15[3]; Epstein, supra, at 168-69, 189. An exception to this general rule exists for third parties employed to assist a lawyer in rendering legal advice. Sup. Ct. Standard 503; Weinstein's Federal Evidence, supra, at §§ 503.12[3][a] and [4][b]. In Kovel, the Second Circuit held that, because "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others," the attorney-client "'privilege must include all the persons who act as the attorney's agents.'" 296 F.2d at 921 (quoting Wigmore, supra, § 2301, at 583).[6]

---

[6] We will assume arguendo that this circuit would adopt the Kovel test or a similar standard, as so many other circuits have done, but we need not decide the question. E.g., United States v. Bornstein, 977 F.2d 112, 116-17 (4th Cir. 1992); United States v.

This logic applies to accountants: "[T]he presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege" when "the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." Id. at 922. The communication, however, must be made "for the purpose of obtaining legal advice from the lawyer." Id. "If what is sought is not legal advice but only accounting service . . . , or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." Id.; see also United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995).

The district court concluded that "Kovel requires that either the Cavallaros, Knight, or Hale and Dorr hired Ernst & Young for the purpose of facilitating a legal communication with Hale and Dorr." Cavallaro, 153 F. Supp. 2d at 57. It said that the Cavallaros must show that "Ernst & Young was an agent of Hale and Dorr, Knight or the Cavallaros." Id. at 58. We know that such a showing is not sufficient to sustain the privilege: as the district court recognized, an attorney, merely by placing an accountant on her payroll, does not, by this action alone, render communications

El Paso Co., 682 F.2d 530, 541 (5th Cir. 1982); In re Grand Jury Proceedings, 220 F.3d 568, 571 (7th Cir. 2000); United States v. Cote, 456 F.2d 142, 144 (8th Cir. 1972); United States v. Judson, 322 F.2d 460, 462-63 (9th Cir. 1963); Fed. Trade Comm'n v. TRW, Inc., 628 F.2d 207, 212 (D.C. Cir. 1980). See also Sup. Ct. Standard 503(b) and 503(a)(3).

-20-

between the attorney's client and the accountant privileged.[7]  <u>Id.</u> at 57; <u>Kovel</u>, 296 F.2d at 921.  We need not reach the question of whether such a showing is necessary.  That is, we need not determine whether, in all instances, the attorney or client (as opposed to some third party) must hire the accountant in order to sustain a privilege under <u>Kovel</u>.

Here, the record does not show that any party hired Ernst & Young to assist Hale and Dorr in providing legal advice, and we note that the agency relationship between the parties is relevant to, but not dispositive of, this question.  <u>Kovel</u> requires that to sustain a privilege an accountant must be "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."  <u>Kovel</u>, 296 F.2d at 922.  This requirement resolves the <u>Kovel</u> dispute because the evidence shows that Ernst & Young was not employed <u>for this purpose</u>.

Whether Hale and Dorr, as opposed to the Cavallaros or their sons, hired Ernst & Young is, as the district court recognized, probative when considering whether Ernst & Young was employed to help Hale and Dorr render legal advice.  Typically, "[a]gents of an attorney are . . . retained by or at the discretion of the attorney and under the attorney's supervision."  Rice,

---

[7]  Accordingly, were the Cavallaros to show that they employed Ernst & Young, or that Knight or Hale and Dorr did so, this alone would be insufficient to bring the disputed communications within <u>Kovel</u>.  <u>See</u> <u>United States</u> v. <u>Gurtner</u>, 474 F.2d 297, 299 (9th Cir. 1973) (stating that not all consultations with accountants, acting as attorneys' agents, are privileged).

supra, § 3:5, at 30.  Here, the bulk of the evidence supports the claim that, at the December 1994 meeting, and going forward, Ernst & Young acted as an agent for the sons or Camelot, but not for Hale and Dorr, the Cavallaros, or Knight.

No one disputes that Camelot initially hired Ernst & Young.  Only one month prior to the December 1994 meeting, Ernst & Young sent Camelot a letter of engagement stating that "[a]ll advice and other services we provide pursuant to this engagement are solely for the benefit of Camelot . . . and are not for the benefit of anyone other than the corporation and its shareholders." Camelot's CFO, David Frac, signed the letter and returned it to Ernst & Young.  Everyone also agrees that Camelot hired Ernst & Young to provide financial advice, not to assist any lawyers. Prior to the December 1994 meeting, Ernst & Young was not in any way coordinating its accounting advice with Hale and Dorr's legal advice.

The Cavallaros say that things changed at the December 1994 meeting.  At that meeting, they say, it was "clear to all parties" that "Ernst & Young began assisting Hale and Dorr with respect to providing advice on transfer tax issues."  They claim that Ernst & Young continued in this role, as an assistant to Hale and Dorr on transfer tax and, later, merger issues, through 1995. More specifically, the Cavallaros argue that Ernst & Young assisted Hale and Dorr in providing legal advice, and improved that advice, by, "[a]mong other things, . . . review[ing] the factual basis of Hale and Dorr's analysis to help determine whether it was

consistent with the accounting records that Ernst & Young had reviewed." The district court properly rejected the argument.

The district court found that "[t]he Cavallaros have not produced any contemporaneous documentation to suggest that, as of December 19, 1994, Ernst & Young's professional relationship with the Cavallaro parents changed in a way that would trigger a privilege." Cavallaro, 153 F. Supp. 2d at 59. The Cavallaros urge that the district court overlooked some evidence. First, that the bill for Ernst & Young's services rendered through December 31, 1994, refers to services rendered to both Camelot and Knight. Second, that Ernst & Young mailed this bill to Mrs. Cavallaro at Knight. Third, that Lawrence Goodman testified that, in 1994, Ernst & Young was involved in providing tax advice to Camelot, Knight, and the Cavallaros. The district court did not mention this evidence, but it does not change the outcome here. None of it is "contemporaneous documentation" of the relationship between the parties at the meeting. The bill was presumably drafted after services were rendered. The parties never formally commemorated this purportedly changed relationship. Mr. Goodman's statement was made after the fact, in the midst of litigation, with little support in the contemporaneous record. The district court did not clearly err when it found as it did.

But all of this is slightly off-topic. The agency question aside, the evidence is strong that Ernst & Young acted to provide accounting advice rather than to assist Hale and Dorr in providing legal advice. Cf. United States v. Judson, 322 F.2d 460,

462-63 (9th Cir. 1963) (Kovel exception covers documents created by an accountant at an attorney's request for the purpose of advising and defending the client). Prior to the December 1994 meeting, Ernst & Young provided accounting advice to Camelot independent of Hale and Dorr. After that meeting, the evidence supports the conclusion that Ernst & Young and Hale and Dorr continued to work on their respective, separate tracks, albeit in a more coordinated way.

We are skeptical of the Cavallaros' claim that Ernst & Young was present to assist attorney Hamel of Hale and Dorr, who was a senior partner of over twenty years' experience, and a specialist in trusts and estates, including, necessarily, consequent tax advice. Recognizing that an attorney's experience alone is not prima facie evidence that an accountant was not "necessary, or at least highly useful," Kovel, 296 F.2d at 922, to the lawyer in providing legal assistance, we note that when a party hires an accountant to provide accounting advice, and only later hires an attorney to provide legal advice, it is particularly important for the party to show that the accountant later acted as an agent necessary to the lawyer in providing legal advice. See Rice, supra, § 3:5, at 33-34 (noting that "when the client has previously employed the agent independent of the attorney-client relationship, to perform the same services that he will perform for the attorney[,]. . . . [t]his creates a risk that the agent's retention by the attorney is simply a subterfuge"); id. at 35 n.66 (citing Swarthmore Radiation Oncology, Inc. v. Lapes, No. 92-3055,

-24-

1994 U.S. Dist. LEXIS 1970, at *9-12 (E.D. Pa. Feb. 18, 1994)). The Cavallaros have failed to make a sufficient showing here.

Contrary to the Cavallaros' assertion that a mere finding that an account was "useful" is all that is required under Kovel, "[t]he available case law indicates that the 'necessity' element means more than just useful and convenient. The involvement of the third party must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications. Mere convenience is not sufficient." Epstein, supra, at 187. The Cavallaros' claim that Ernst & Young "had the capacity to benefit the quality of the legal advice that Hale and Dorr would render" and that, "[a]mong other things," Ernst & Young double-checked Hale and Dorr's legal advice to make sure "it was consistent with the accounting records that Ernst & Young had reviewed" is not enough to show that Ernst & Young was necessary, or at least highly useful, in facilitating Hale and Dorr's provision of legal advice. That ends the matter.

## B. Common Interest

The common-interest doctrine is typically understood to apply "[w]hen two or more clients consult or retain an attorney on particular matters of common interest." Weinstein's Federal Evidence, supra, § 503.21[1]; Wigmore, supra, § 2312, at 603-09. In such a situation, "the communications between each of them and the attorney are privileged against third parties." Weinstein's Federal Evidence, supra, § 503.21[1]; see also In re Grand Jury Subpoena, 274 F.3d at 573; Fed. Deposit Ins. Corp., 202 F.3d at

461. Similarly, the "privilege applies to communications made by the client or the client's 'lawyer to a lawyer representing another in a matter of common interest.'" Weinstein's Federal Evidence, supra, § 503.21[2] (quoting Sup. Ct. Standard 503(b)(3)).

Whether one refers to either or both of these instances as "common interest," "joint defense," "joint client," or "allied lawyer" doctrines does not change the outcome of this case. The common-interest doctrine, like the rule announced in Kovel, is "not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." Epstein, supra, at 196.

Our resolution of the Cavallaros' Kovel argument resolves their common-interest claim as well. Although the district court directed its inquiry toward the alignment of interests between all of the parties in the case and then decided that, "[e]ven if there were a sufficient commonality of interest, . . . . [u]nder the strict confines of the common-interest doctrine, the lack of representation for [the sons and Camelot] vitiates any claim to a privilege," 153 F. Supp. 2d at 60, we do not need to reach these issues.

Ernst & Young was not covered by the attorney-client relationship between Hale and Dorr and its clients. Even if the Cavallaros, their sons, and their respective companies all had an exact unanimity of interest, it would not render communications created by or shared with Ernst & Young privileged when Ernst &

-26-

Young was providing accounting services, not facilitating communication of legal advice between Hale and Dorr and its clients.

The common-interest doctrine prevents clients from waiving the attorney-client privilege when attorney-client communications are shared with a third person who has a common legal interest with respect to these communications, for instance, a codefendant. The doctrine does not extend to prevent waiver when an accountant, not within the Kovel doctrine, is made privy to the attorney-client communications. In such an instance, the accountant does not share an interest in receiving legal advice from the lawyer and cannot logically be said to have an interest in common with the represented party or parties. Under Kovel, we know that when a client, a lawyer, and an accountant are present, the accountant's presence will destroy the privilege if the accountant is not "necessary, or at least highly useful, for the effective consultation between the client and the lawyer." 296 F.2d at 922. It follows that the client -- in this case the Cavallaros -- cannot resurrect the privilege by adding another party (their sons) and that party's accountant to the mix. This is true even if the sons share a common interest with the parents. To hold otherwise would be to create a loophole in Kovel whereby the privilege is undermined when a client and his attorney disclose information to an accountant who is not "necessary, or at least highly useful, for the effective consultation between the client and the lawyer," 296 F.2d at 922, but the privilege is preserved when the client brings

-27-

another party with a common interest on board and that other party's accountant is present.

The Cavallaros' argument that every party to the communication need not have his own lawyer in order for the common-interest doctrine to apply, although relevant to the district court's reasoning, is in the end beside the point, whether or not the argument is valid. Our conclusion that the documents are not privileged under Kovel resolves the common-interest claim because the common-interest rule presumes a valid underlying privilege. There is no valid underlying privilege here because, by having discussions with, and disclosing the documents to, Ernst & Young, an accounting firm not necessary to permit Hale and Dorr to communicate legal advice to its client, the Cavallaros either waived the attorney-client privilege or undermined the privilege's confidentiality requirement. One cannot create a privilege, where previously there was none, simply by introducing a third party (with or without a common interest) into the circle within which documents are shared.

## III.

For these reasons, the district court's judgment, denying the Cavallaros' motion to quash the summons and allowing the United States's motion to enforce the summons, is affirmed.