# United States Court of Appeals
## For the First Circuit

No. 02-1205

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ PADILLA-GALARZA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Boudin, Chief Judge,
Howard, Circuit Judge,
and DiClerico,[*] District Judge.

Juan Ortiz-Lebrón, by appointment of the court, for appellant.
Marcos E. López, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, and Sonia I. Torres, Assistant United States Attorney, Chief, Criminal Division, were on brief for appellee.

December 12, 2003

---

[*]Of the District of New Hampshire, sitting by designation.

**BOUDIN, Chief Judge**. Jose Padilla-Galarza pled guilty in the district court in Puerto Rico to a drug trafficking crime pursuant to a plea agreement. After the plea but before sentence, Padilla sought unsuccessfully to withdraw his plea. On this appeal, he challenges the decision rejecting his motion to withdraw; he also contests the lawfulness of a sentencing condition imposed by the district court.

Padilla, a former police officer, was indicted in 1999 for conspiring to possess cocaine with intent to distribute (count I) and for aiding and abetting the other members of the conspiracy to possess cocaine with intent to distribute (count II). 21 U.S.C. § 841(a)(1) (2000); 18 U.S.C. § 2 (2000). The indictment made clear that the government proposed to attribute to him in excess of 5 kilograms of cocaine, which would trigger a statutory 10-year minimum sentence. 21 U.S.C. § 841(b)(1)(A) (2000). A further count (count III) sought criminal forfeiture of property acquired through drug proceeds, specifically naming an apartment that Padilla had purchased in Isla Verde in San Juan. 21 U.S.C. § 853(a)(1)-(2) (2000).

The government's version of the facts, which Padilla later adopted, are that during the summer of 1995, Padilla was part of a drug conspiracy involving the shipment of cocaine to the New York area, that he assisted others in preparing a shipment in Puerto Rico, that he participated in the theft of a part of the

-2-

shipment, that he himself received several kilos which he then distributed, and that a portion of the proceeds were used to buy an apartment in Isla Verde.

On September 11, 2000, about a year after his indictment and arrest, Padilla--then represented by counsel Marlene Aponte--entered into a detailed plea agreement with the government. By the agreement, Padilla admitted to the facts just described and agreed to plead to the second and third counts of the complaint. The government agreed to drop the first count and to stipulate with Padilla that he would be held accountable for between 3.5 and 5 kilograms; and the parties further agreed to specific guideline calculations and to a sentence of 60-months' imprisonment which fell within the calculated guideline range.

The agreement was designated as one under Federal Rule of Criminal Procedure 11(e)(1)(c),[1] so that the judge if he accepted the agreement was acquiescing in the sentence. Conversely, if the judge chose not to sentence in accordance with the stipulated sentence, Padilla had the right to withdraw the plea. On the same day, the court conducted a plea hearing, at which Padilla was informed of the charges, agreed to the facts alleged by the government, was apprised again of the 60-month sentence

---

[1]The Federal Rules of Criminal Procedure were amended in 2002, and Rule 11(e) became, with minor changes not relevant to this appeal, Rule 11(c).

contemplated by the agreement, and listened to the recitation of rights waived by forgoing a trial.

There were a few wrinkles. Padilla, although he had signed the agreement conceding the government's version of the facts and pled guilty to counts II and III, said no more about them at the hearing than he agreed that the government could "probably" prove the facts. On one or two occasions, Aponte answered questions arguably addressed by the court to Padilla himself. Most important to this appeal, some confusion attended the discussion of two topics--the possibility of Padilla serving some of his sentence under the so-called boot camp regime and the forfeiture of the apartment--to which we will return.

Padilla was returned to prison to await sentencing, and Aponte visited him there on November 21, 2000. According to her motion to withdraw filed the following day, Padilla behaved in a distraught manner, said that at least one of the witnesses against him had lied, threatened and insulted Aponte, and insisted that he wanted to go to trial. At about the same time, Padilla filed a pro se motion to withdraw his guilty plea. In December 2000, the district court appointed new counsel and referred the motion to withdraw the plea to a magistrate judge who held a hearing in May 2001 at which Padilla was the only witness.

Padilla claimed at the hearing that he had only cursorily reviewed the agreement and been told by Aponte that he should trust

her, that she had written replies for him to make to the court, and that she had misled him about the boot camp program and about the forfeiture in respects described below. He also said that, contrary to his statements to the court at the plea hearing, he had been depressed at the time of the hearing, had not been taking anti-depressants that had been prescribed for him, and was upset by his impending divorce. He said that an "overwhelming amount of exculpatory" evidence--never described in detail--had been kept from him by Aponte.

The magistrate judge, while saying that the motion was not frivolous, nevertheless recommended that the motion be denied. The report said that the plea had been voluntary and not coerced and that Padilla (who had extensive experience as a policeman) had understood the charges and knowingly and intelligently acquiesced in the bargain. The magistrate judge said that the boot camp issue was peripheral and within the ultimate control of the Bureau of Prisons. The report also discussed briefly, and without endorsement, Padilla's basis for his present claim of innocence. Padilla filed objections to the report.

Thereafter, the district court denied the motion to withdraw the plea and sentenced Padilla to the 60-month term of imprisonment specified in the original agreement. As to boot camp, the judge recommended that Padilla be admitted to the program when he had served enough of his sentence to become eligible. The court

also imposed a 48-month term of supervised release following imprisonment, adding as a condition that:

> The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

This appeal followed.

The major issue is the denial of the motion for withdrawal of the guilty plea. The district court may allow withdrawal for "a fair and just reason," Fed. R. Crim. P. 11(d)(2)(B),[2] but the case law suggests that among the relevant factors are whether the plea was voluntary, intelligent, knowing and complied with Rule 11; the force of the reasons offered by the defendant; whether there is a serious claim of actual innocence; the timing of the motion; and any countervailing prejudice to the government if the defendant is allowed to withdraw his plea. United States v. Marrero-Rivera, 124 F.3d 342, 347 (1st Cir. 1997).

---

[2]At the time it was filed, Padilla's motion was governed by Federal Rule of Criminal Procedure 32(e). As part of the 2002 amendments, see note 1, supra, that section was relocated as Rule 11(e), but without any substantive change pertinent to this case.

-6-

The customary standards of review apply but a good deal of discretion is accorded to the district court.  <u>Id.</u> at 348.[3]

We begin with the questions whether Padilla pled guilty intelligently, knowingly and voluntarily and whether the court adequately observed the formalities imposed by Rule 11, which are intended to assure that the defendant understands the charge and the consequences of the plea.  <u>United States</u> v. <u>Cotal-Crespo</u>, 47 F.3d 1, 4 (1st Cir. 1995), <u>cert. denied</u> 516 U.S. 827 (1995).  Padilla's current claim that he did not carefully review the written document and that his counsel coached him as to the responses is not by itself enough to show that the plea was uninformed.  Padilla assured the court at the time of the plea that he had reviewed the agreement and the government's appended version of the facts and discussed it with counsel.

Ordinarily, a defendant is stuck with the representations that he himself makes in open court at the time of the plea.  <u>See</u> <u>United States</u> v. <u>Butt</u>, 731 F.2d 75, 80 (1st Cir. 1984).  They are more likely to be reliable than later versions prompted by second thoughts, and guilty pleas--often in the defendant's interest--

_____

[3]Abstract questions of law are reviewed <u>de novo</u>, findings of raw fact are tested for clear error, and law application and balancing judgments are usually reviewed for reasonableness, <u>e.g.</u>, <u>Cavallaro</u> v. <u>United States</u>, 284 F.3d 236, 245 (1st Cir. 2002); the degree of deference may vary, <u>Sierra Fria Corp.</u> v. <u>Donald J. Evans, P.C.</u>, 127 F.3d 175, 181 (1st Cir. 1997), and there are a few flat exceptions to deference.  <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690, 698-99 (1996).

could hardly be managed any other way. Further, the main terms of the agreement were spelled out by the judge and prosecutor in open court, and the government's version of the facts was read aloud.

The Rule 11 colloquy was not perfect--few are unless the judge works mechanically from a script--but the flaws were minor and do not undermine the rule's core objectives. See Cotal-Crespo 47 F.3d at 4-5. True, the court did not spell out the abstract elements of the offense, compare Fed. R. Crim. P. 11(b)(1)(G), but neither is drug trafficking an obscure crime to a policeman. See Cotal-Crespo, 47 F.3d at 5-6 ("complexity of the charges" and "capacity of the defendant" relevant). And while counsel should not have answered once or twice for her client, Padilla's own answers were adequate.

Some trial judges might have pursued the term "probably" in Padilla's concession of what the government could prove, but he had signed an unqualified admission of the crime and pled to it in open court. If a defendant believes he is guilty, he may plead guilty because he thinks the government can "probably" prove his guilt. The Alford issue--that of a defendant who wants to plead guilty while denying that he actually committed the crime--involves quite different concerns. See North Carolina v. Alford, 400 U.S. 25, 37-38 (1970).

Even now, Padilla's brief offers no straightforward and plausible claim of actual innocence, cf. United States v. Ramos,

810 F.2d 308, 313 (1st Cir. 1987), and Padilla's suggestions in his withdrawal motion of powerful exculpatory evidence have not been developed on this appeal. In this court, when Padilla sought yet another counsel after the briefing, we told him he could submit a pro se supplemental brief. None has been forthcoming and, while he has complained of lack of access to his papers, he should by now have been able to address any evidence pointing to his innocence.

There remains the possibility that Padilla was suffering from some serious emotional or mental impairment at the time of the plea. It appears that he misled the district judge in saying that he had never had any treatment for such a condition, and Aponte said based on his behavior at the prison that at that time she deemed him irrational. For obvious reasons, this is one of the subjects where the defendant's own assurances in open court at the time of the plea may be given less weight if later evidence to the contrary emerges.

But at the plea hearing Aponte said that she had no concern about Padilla's condition and the magistrate judge, who watched Padilla testify not long afterward, found him articulate and in command of himself. Padilla's new counsel at the hearing was free to call Aponte, or a psychiatrist, or both, but did not do so. The burden is upon Padilla, as the one attacking the plea, to show the circumstances justifying relief from the plea, United States v. De Alba Pagan, 33 F.3d 125, 127 (1st Cir. 1994), and he

has done no more on the issue of capacity than raise limited doubts.

Padilla's most concrete suggestions that the plea was not an intelligent one concern the issues of boot camp and forfeiture. To these we now turn, adding the detail earlier omitted. As to both issues, the record confirms that there was some confusion at the time of the plea and both issues have been of continuing concern to Padilla. We conclude, however, that in each case the confusion did not prejudice Padilla's legitimate expectations. See Cotal-Crespo, 47 F.3d at 5.

As to the boot camp issue, the plea agreement provided that the government "will not oppose [Padilla's] request that he participate[] in the shock incarceration program (commonly known as the "boot camp") and will leave the sentence to the sound discretion of the Court." The boot camp program, which combines strict discipline and job training, is authorized by statute, 18 U.S.C. § 4046 (2000), and where the six month in-prison component is successfully completed, can result in a further six months' reduction in sentence. 28 C.F.R. § 524.32(d)(3) (2003). The Bureau of Prisons decides who may participate but a recommendation by the judge is given weight. U.S.S.G. § 5F1.7, p.s., & cmt.

(1998); Federal Bureau of Prisons, U.S. Department of Justice, Program Statement No. 5390.08 at 6 (Nov. 4, 1999).[4]

At the plea hearing, the court quoted the boot camp provision and asked whether "you" will leave this matter to the discretion of the court? Padilla's counsel, perhaps misunderstanding who "you" referred to, said "we understand" and no more was said about the subject at the plea. Thereafter, Padilla apparently became persuaded that he was never eligible for the program at all and urged this as a reason for permitting the withdrawal of his plea.

On appeal, Padilla argues that he had a disciplinary mark against him at the facility where he was being held, that this was incurred prior to the plea agreement, and that Aponte should have known about it and known also that this would disqualify Padilla from the boot camp program. A mistaken belief by Padilla that he could be a candidate for the boot camp program, if indirectly fostered by the plea agreement and the trial judge, might be relevant--though not necessarily decisive--in weighing his request to withdraw the plea. But no evidence is before us that a disciplinary mark against Padilla at the prison where he was

---

[4]The program is available for several categories of defendants including those serving sentences between 30 and 60 months who are within 24 months of their projected release date. 28 C.F.R. § 524.31(a)(1)(ii) (2003). Thus, Padilla if sentenced under the agreement would be a candidate, although no more than that, for the program.

-11-

temporarily being held would disqualify him from later participation in the boot camp program.

By contrast, there was confusion about the forfeiture issue. The government's version of the facts in the plea agreement said that Padilla used a portion of the proceeds from the drugs he and others stole from the cocaine shipment "to purchase the La Mancha apartment in Isla Verde." Although Padilla had signed the plea agreement incorporating this admission, at the plea hearing Aponte herself raised the subject when the judge asked whether Padilla was content with the agreement:

> We have explained to our client and he has expressed one small--for purposes of clarity of the proceedings and for his behalf--I will request permission from the Court to address it on the record--my client expressed the doubt since he had forfeiture found of an apartment that's not in his name, that is in a third person's--third party's name, and in which he purchased with a power of attorney on behalf of his brother, I explained to him that by pleading guilty to the forfeiture count, since he has always stated that the apartment is not his, that actually he would be relinquishing the right to contest that forfeiture since he does not have any interest in the apartment.

> He, nevertheless, would have no standing to contest it anyway. He asserts it's not his. So the only net effect that this plea agreement would have is that he agrees under the terms of the plea agreement not to contest the criminal forfeiture in this case in which he appears to have in that count, and that doesn't bind--the Government has to go against the other parties.

The judge then endorsed the view that standing to contest the forfeiture lay with the party claiming ownership and asked, "Do you have any doubts as to that now?" Aponte, who may have thought this addressed to her, said "no" and Padilla said nothing. Later in the plea hearing Padilla agreed that he was pleading guilty to counts II and III, and in a brief colloquy Padilla seemed to concur with the judge's statement that he was admitting that he had obtained the apartment with drug money.

Padilla's argument on appeal concerning the forfeiture is not straightforward. The main suggestion is that Padilla never admitted purchasing the apartment with drug money but was dissuaded from saying so in court by the earlier colloquy between counsel and the judge concerning standing. But Padilla did admit purchasing the apartment with drug money three times: once by signing the plea agreement, once by pleading guilty to count III, and once in response to the judge's inquiry after he said the government could "probably" prove those facts.

Padilla was surely confused about something: Aponte's comments in court did not come out of thin air, and her later confrontation with Padilla at the prison seems to have been prompted in part by Padilla's belief that his plea would facilitate the forfeiture. According to the government's charge, it appears that Padilla had purchased the apartment in the name of his brother

and hoped to resist its forfeiture--on what basis is unclear even now.

In his brief on appeal, Padilla's counsel suggests that his client has maintained "[t]hroughout" that "he did not own the La Mancha apartment." But this is not a denial that he bought it in his brother's name with drug money--apparently the government's position--so there is no necessary conflict between this contention and Padilla's plea and admissions at the plea hearing already described. Even now, there is nothing to suggest that Padilla has any basis for denying the government's version.

We add that the district judge was correct insofar as he led Padilla to believe that the forfeiture was primarily a matter between the government and the current named owner of the apartment. That owner is free to dispute that the apartment was purchased with drug money or to offer any version of events that could militate against forfeiture of that owner's interest. 21 U.S.C. § 853(n) (2000). The only one who has effectively given away any defense against forfeiture is Padilla who, according to his present brief, does not claim to own the apartment.

Padilla was represented at the plea hearing by one counsel and in the withdrawal request by another. His present appellate counsel suggests that both of these lawyers provided inadequate representation to Padilla in a variety of respects. Such claims are rarely considered on direct appeal because almost

always they require factual development available primarily through post-conviction remedies, see United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993), cert. denied 511 U.S. 1086 (1994); importantly, it is very rare that one can condemn counsel as incompetent without knowing why counsel made the choice under attack. See Marrero-Rivera, 124 F.3d at 353.

There are occasional exceptions where the facts are fully developed on direct appeal, see, e.g., United States v. Austin, 948 F.2d 783, 785 (1st Cir. 1991), or the choice one that no reasoning could support, see U.S. v. McKenna, 327 F.3d 830, 845 (9th Cir. 2003), cert. denied 124 S. Ct. 359 (2003), but nothing like that is remotely present in this case. The government apparently had co-conspirator witnesses available to testify against Padilla so Aponte may well have secured for Padilla a sentence half or less of what he would otherwise likely have suffered. He can pursue his competence claims in the conventional way.

The last issue in the case relates solely to the sentence. Padilla claims that one of the conditions of his supervised release is vague, arbitrary, and unconstitutional. Because Padilla did not object to this special condition at sentencing, our review is limited to a search for "plain error." United States v. Phaneuf, 91 F.3d 255, 262 (1st Cir. 1996).

The condition in question is described in the judgment against Padilla as follows:

> The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; <u>the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition</u>. (emphasis added).

At Padilla's sentencing hearing, the district court used slightly different language: "The Defendant shall warn any other residents at a premises [sic] that they may be subjected to a search pursuant to this condition." On appeal, Padilla argues that the condition implies that probation officers will be allowed to search <u>the person</u> of anybody they find on the "premises" described and that Padilla is obligated to inform guests and visitors of this possibility.

We need not concern ourselves with the enduring question whether the spoken or written judgment has priority, <u>see, e.g.</u>, <u>U.S.</u> v. <u>Sines</u>, 303 F.3d 793, 799-800 (7th Cir. 2002), because it is clear to us in context that Padilla's <u>premises</u>, not the people themselves other than Padilla, are the subject of the possible search and required warning. Since Padilla's constitutional objection is premised on the right of visitors not to be searched pursuant to the condition, this clarification of the judgment resolves the issue.

<u>Affirmed</u>.